## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Vickie B. and D.B.,

                Plaintiffs,

                         Case No. 1:25-cv-3054-MLB

v.

Anthem Blue Cross and Blue
Shield and Bank of America Group
Benefits Program,

                Defendants.

_____/

## OPINION & ORDER

Defendants Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and the Bank of America Group Benefits Program move to partially dismiss Plaintiffs' claims under the Employee Retirement Income Security Act of 1974 ("ERISA"). (Dkt. 31.) The Court grants in part and denies in part that motion.

## I.    Background

Plaintiff Vickie B. is a participant in a self-funded employee welfare benefits plan, the Bank of America Group Benefits Program (the "Plan").

(Dkt. 1 ¶ 3.)  Vickie B. is the mother of Plaintiff D.B., a beneficiary of the Plan.  (*Id.*)  Defendant Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the third-party claims administrator of the Plan, as well as a fiduciary under ERISA.  (*Id.* ¶ 2.)

D.B. has a history of anxiety, ADHD, and drug and alcohol abuse. (*Id.* ¶¶ 10–15.)  In February 2022, D.B. was admitted to Wingate Wilderness Therapy ("Wingate"), a treatment facility in Kane County, Utah, that provides "sub-acute treatment to adolescents with mental health, behavioral, and/or substance abuse problems."  (*Id.* ¶ 4.)  Anthem denied payment for D.B.'s treatment at Wingate because it claimed the treatment was not a covered service under the Plan.  (*Id.* ¶ 17.)  Vickie B. appealed the denial of benefits.  (*Id.* ¶ 18.)  Anthem upheld its determination, finding Wingate was an "alternative residential program" under the Plan but did not meet the Plan's requirements for coverage under that designation.  (*Id.* ¶ 31; Dkt. 31-2 at 78.)[1]

---

[1] Although Plaintiffs do not attach the Plan to their Complaint, the Court can consider that document, which Defendants attach to their motion (Dkt. 31-2), under the incorporation-by-reference doctrine.  It permits a court to consider a document excluded from the complaint if that

In May 2022, D.B. was admitted to Crossroads Academy ("Crossroads"), a treatment facility in Weber County, Utah. (Dkt. 1 ¶ 4.) D.B. received mental health, behavioral, and substance abuse treatment. (*Id.*) Anthem initially denied payment because Vickie B. did not seek preapproval for the benefit. (*Id.* ¶ 33.) Vickie B. appealed the denial. (*Id.* ¶ 34.) Anthem once again denied payment, this time finding D.B. did not meet the Plan's medical necessity requirements for residential mental health treatment. (*Id.* ¶ 36.) Vickie B. submitted another appeal six months later, and Anthem upheld its determination that D.B.'s treatment was not medically necessary. (*Id.* ¶ 46.) Vickie B. subsequently asked for the denial to be evaluated by an external review agency. (*Id.* ¶ 47.) That entity upheld Anthem's decision. (*Id.* ¶ 53.)

Plaintiffs filed this action, bring two claims under Section 1132 of ERISA. (Dkt. 1.) Count I alleges Defendants violated Section 1132(a)(1)(B) of ERISA by denying coverage for Wingate and Crossroads

---

document is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). The Plan satisfies both requirements.

in violation of the terms of the Plan. (*Id.* ¶¶ 56–62.) Count II alleges Defendants violated the Mental Health Parity and Addiction Act of 2008, 29 U.S.C. §11895a, and seeks relief under Section 1132(a)(3) of ERISA. (*Id.* ¶¶ 63–83.) Defendants moved to partially dismiss the Complaint. (Dkt. 31.) They seek dismissal of all claims besides Count I as it pertains to the denial of benefits at Crossroads. (*Id.*) Plaintiffs opposed. (Dkt. 36.)

## II.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This requires more than a "mere possibility of misconduct." *Id.* at 679. A plaintiff's well-pled allegations must "nudge[] [her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III. Discussion

### A. Count I: Claim for Payment of Benefits for Wingate Under 29 U.S.C. §1132(a)(1)(B)

29 U.S.C. § 1132(a)(1)(B) "empowers ERISA participants and beneficiaries to bring a civil action in order to recover benefits, enforce rights to benefits, or clarify rights to future benefits due under the terms of an ERISA-governed welfare benefit plan." *Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d 1065, 1069 (11th Cir. 2004). To state a plausible claim under § 1132(a)(1)(B), a plaintiff "must provide the court with enough factual information to determine whether the [benefits] were indeed covered services under the plan." *H.H. v. Aetna Ins. Co.*, 342 F. Supp. 3d 1311, 1316 (S.D. Fla. 2018). "A plaintiff must identify a specific term of the plan that covers the services at issue and must provide facts sufficient to show that the services meet whatever requirements the plan imposes for coverage." *Id.*

The Plan includes coverage for mental health and chemical dependency treatment. The relevant provision states that the covered services "**include, but aren't limited to**" acute inpatient and partial hospitalization, outpatient office visits, intensive outpatient programs, residential treatment, and methadone clinics or other medication-

assisted treatment programs. (Dkt. 31-2 at 68 (emphasis added).) It further states that an approved treatment facility must be accredited by The Joint Commission on Accreditation of Healthcare Organizations or an appropriate state licensing board, provide 24-hour nursing care, and have an onsite psychiatrist to provide weekly assessments. (*Id.*) Another provision of the plan states that Anthem will not pay for expenses incurred for "alternative residential programs, such as wilderness camps or military schools, unless they are licensed in their state as a residential treatment facility, provide 24-hour nursing care, and have an onsite psychiatrist to provide weekly assessments." (*Id.* at 78.)

Anthem denied coverage for D.B.'s treatment at Wingate because it found the facility was an "alternative residential program" that did not satisfy those conditions. (*Id.* ¶ 31.) In Count I, Plaintiffs seek to recover those expenses. (Dkt. 1 ¶ 56.) Defendants move to dismiss Count I as it pertains to Wingate, arguing "Plaintiffs fail to allege any facts that would allow the Court to award benefits for D.B's services at Wingate." (Dkt. 31 at 2.) Specifically, Defendants contend Plaintiffs did not—and could not—plead that Wingate met each of the three criteria for coverage of alternative residential programs or for qualification as an approved

"treatment facility" under the Plan.  (*Id.* at 7.)  In response, Plaintiffs make several arguments as to why the Complaint adequately alleges D.B.'s treatment at Wingate was covered by the Plan, even though they did not allege Wingate met each of the relevant criteria.  (Dkt. 36 at 6–9.)

Plaintiffs' first argument is puzzling.  They argue Wingate's services were covered under the Plan because the language defining covered mental health and chemical dependency services is "inclusive rather than exclusive."  (*Id.* at 6.)  Because the covered services "include but aren't limited to" the services expressly listed in the plan, Plaintiffs suggest their "factual allegations that Wingate provided mental health services to D.B. [are] sufficient to satisfy the Plan language."  (*Id.* at 7 (citing Dkt. 31-2 at 68).)  Plaintiffs' argument reads one line of the Plan in isolation, ignoring the very next sentence which includes the above-discussed requirements of an approved treatment facility.  (Dkt. 31-2 at 68.)  The Court cannot ignore this language.  Plaintiffs' reliance on the isolated language does not plausibly show their entitlement to benefits under the Plan—only allegations showing compliance with *all* the Plan's requirements can do that.  *See Hall v. United of Omaha Life Ins. Co.*, 741

F. Supp. 2d 1348, 1354 (N.D. Ga. 2010) ("[Plaintiff's] suggestion that the Court should only look to one part of the plan is unreasonable, as the Court must look at the entire plan.")

Seeking to avoid the application of the mental health and chemical dependency "treatment facility" requirements, Plaintiffs next argue Wingate does not meet the Plan's definition of such a facility, thus precluding its assessment under those requirements. (Dkt. 36 at 8.) Plaintiffs say the Plan defines a treatment facility as one that *only* deals with substance abuse issues. Because D.B. received both substance abuse and mental health treatment, Plaintiffs say the facility requirements do not apply. (*Id.*) As Defendants point out, however, Plaintiffs cite to the wrong definition of "treatment facility"—relying on a definition contained in the Plan's coverage for Long-term Disability (benefits not at issue here). (Dkt. 37 at 3, n. 1.) Plaintiffs' claims arise under the Plan's Covered Medical Services, which does not define "treatment facility" in discussing mental health and chemical dependency services. But even without a specific definition in that section of the Plan, Wingate fits comfortably within the "plain and ordinary meaning" of a treatment facility. *Alexandra H. v. Oxford Health*

*Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016) ("We first look to the plain and ordinary meaning of the policy terms to interpret the [Plan].")  It just does meet the requirements of an "approved treatment facility" for coverage under the Plan's relevant provision.  And, even if Wingate was not a "treatment facility," that still would not entitle Plaintiffs to coverage.  That's because, by its express terms, the Plan only provides coverage for residential mental health and chemical dependency treatment in an "approved treatment facility."  (Dkt. 31-2 at 68.)  For these reasons, Plaintiffs fail to allege plausibly that Wingate *was not* subject to the Plan's requirements for coverage at a "treatment facility." *See H.H.*, 342 F. Supp. 3d at 1316.

Plaintiffs also allege Wingate was an "outdoor behavioral health program" rather than a "wilderness camp" or any other type of alternative residential program.  (Dkt. 1 ¶¶ 19, 24, 77.)  Plaintiffs thus argue the Plan's conditional exclusion of "alternative residential programs" for mental health and chemical dependency treatment—like wilderness camps and military schools—does not preclude coverage for Wingate.  (Dkt. 36 at 8.)

9

Putting aside the fact that the facility is named "Wingate **Wilderness** Therapy," a residential "outdoor behavioral health program" fits within the plain meaning of an "alternative residential program." (Dkts. 1 ¶ 4; 31-2 at 78); *see Alexandra H.*, 833 F.3d at 1307. Despite Plaintiffs' artful pleading, they fail to allege plausibly that Wingate *is not* an "alternative residential program" and thus subject to the Plan's conditional exclusion for such services. (Dkt. 31-2 at 78.)

Finally, Plaintiffs argue the Plan's requirement of 24-hour nursing and an onsite psychiatrist services for "treatment facilities" and "alternative residential programs" is "not consistent with generally accepted [sic] at outdoor behavioral health providers." (Dkt. 36 at 7.) The Court is unsure how this fact supports Plaintiffs' argument they "sufficiently alleged that the services D.B. received at Wingate were entitled to coverage." (Dkt. 36 at 6.) It seems more like an argument that the terms of the Plan are unfair rather than an argument that Defendant misapplied or misinterpreted the plan. Regardless, "[under ERISA,] employers have large leeway to design disability and other welfare plans as they see fit." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003).

No matter what Plaintiffs call it, Wingate was a "treatment facility" and, likely, an "alternative residential program." And they do not allege it met the Plan requirements of an "approved treatment facility"—that is accreditation or licensure by the proper body, 24-hour nursing care, and an onsite psychiatrist. (Dkt. 31-2 at 68, 78.) Those allegations simply are not in the Complaint. Thus, Plaintiffs failed to plead "facts sufficient to show that [Wingate met] whatever requirements the plan imposes for coverage." *H.H.*, 342 F. Supp. 3d at 1316. The Court dismisses Plaintiffs' § 1132(a)(1)(B) claim for benefits at Wingate.

## B.    Count II: Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3)

In Count II, Plaintiffs seek equitable relief under § 1132(a)(3) of ERISA to redress Defendants' alleged violations of the Mental Health Parity and Addiction Act of 2008 ("Parity Act"). (Dkt. 1 ¶¶ 63–85.) The Parity Act, codified at 29 U.S.C. §11895a, is an amendment to ERISA that was "enacted [] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *H.H.*, 342 F.Supp.3d at 1319. Section 1132(a)(3) allows a participant or beneficiary to "obtain other appropriate equitable

relief" to redress violations of ERISA, including the Parity Act.  29 U.S.C.

§ 1132(a)(3).[2]

### 1.    Plaintiffs' Section 1132(a)(3) Claim Is Not Impermissibly Duplicative

Defendants argue Plaintiffs may not bring a claim under Section

1132(a)(3) because such a claim is duplicative of their Section

1132(a)(1)(B) claim and, thus, barred.  (Dkt 31-1 at 11–13.)

Section 1132(a)(3) is a "'catchall' provision that authorizes only

*appropriate equitable relief*, and, thus, 'where Congress elsewhere

provided adequate relief for a beneficiary's injury, there will likely be no

need for further equitable relief, in which case such relief normally would

not be appropriate.'"  *Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d

1065, 1073 (11th Cir. 2004) (emphasis added) (quoting *Varity Corp. v.

Howe*, 516 U.S. 489, 513 (1996)).  Put differently, the purpose of Section

1132(a)(3) is to "act as a safety net, offering appropriate equitable relief

---

[2] Section 1132(a)(3) reads in full: "A civil action may be brought: … (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other *appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  (Emphasis added).

for injuries caused by violations [of ERISA] that [§ 1132] does not elsewhere adequately remedy." *Varity Corp.*, 516 U.S. at 512. So when an ERISA plaintiff has an adequate remedy under Section 1132(a)(1)(B), he or she cannot alternatively plead and proceed under Section [1132](a)(3). *Jones*, 370 F.3d at 1072-73. To determine whether a plaintiff has an "adequate remedy" under Section 1132(a)(1)(B), the Eleventh Circuit instructs district courts to consider whether "the allegations supporting the Section 1132(a)(3) claim are also sufficient to state a cause of action for benefits under Section 1132(a)(1)(B)"—if the answer is "yes," the plaintiff has an adequate remedy and "must proceed under Section 1132(a)(1)(B) instead of Section 1132(a)(3)." *Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 916 (11th Cir. 2022).

Defendants say Plaintiffs may not bring a claim under Section 1132(a)(3) because: (1) both Count I and Count II arise from the same underlying conduct and rely on similar allegations, meaning Plaintiffs have an adequate remedy under Count I, and (2) in Count II Plaintiffs actually seek compensatory relief under the guise of equitable relief, in violation of Section 1132(a)(3). (Dkt. 31-1 at 12–14.) The Court disagrees on both accounts.

As to the first argument, Plaintiffs' Section 1132(a)(1)(B) and Section 1132(a)(3) claims are not both "based on … Defendants' improper[] den[ial] of D.B.'s treatment at Wingate and Crossroads" as Defendants suggest  (Dkt. 31-1 at 12.)  That description only applies to their claims in Count I.  Plaintiffs' allegations in that count concern Defendants' *application* of the Plan's requirements for coverage of D.B.'s treatment at Wingate and Crossroads.  (Dkt. 1 ¶¶ 56–62 ("Anthem and the Plan failed to provide coverage for D.B.'s treatment in violation of the express terms of the Plan.").)  In Count II, however, they shift their allegations and focus to the *substance* of the Plan's coverage requirements themselves, particularly as they compare to the Plan's requirements for medical and surgical treatment.  (Dkt. 1 ¶¶ 63–83 ("The medical necessity and facility eligibility criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.").)

Further, Plaintiffs' allegations supporting Count II would not be "sufficient to state a cause of action" under Count I.  *Gimeno*, 38 F.4th at 916.  Plaintiffs' allegations in Count II that Defendants' criteria for

medical necessity of mental health treatment were unfairly restrictive compared to those applied to medical or surgical treatment, for example, may support a Parity Act claim under Section 1132(a)(3). That allegation, however, would do little to show D.B.'s satisfaction of those criteria to support a claim for benefits under Section 1132(a)(1)(B). (Dkt. 1 ¶ 71.) This suggests Plaintiffs' "allegations supporting the Section 1132(a)(3) claim are [not] also sufficient to state a cause of action for benefits under Section 1132(a)(1)(B)" and indicates they do not have an "adequate remedy" for all their grievances under the latter provision. *Gimeno*, 38 F.4th at 916.

Plaintiffs' Section 1132(a)(1)(B) and Section 1132(a)(3) claims can comfortably coexist. It could be that Plaintiffs are made whole in terms of monetary relief under her denial of benefits claim, but moving forward Plaintiffs could still be subject to terms of the Plan that violate the Parity Act. Although Plaintiffs' denial of benefits and Parity Act claims are based on a shared set of allegations for the most part, they involve several unique allegations, seek redress for different injuries, and rely on different theories of recovery. This suggests the claims are not impermissibly duplicative.

15

Defendants' second argument fares no better. In Count II, Plaintiffs request eight forms of injunctive, declaratory and other equitable relief.[3] (Dkt. 1 ¶ 84.) Defendants argue Plaintiffs' requests disguise the legal nature of their claim by "cloaking the relief sought in equitable language." (Dkt. 31-1 at 12.) Specifically, Defendants take issue with Plaintiffs' requests for disgorgement, surcharge, accounting, equitable estoppel, reformation, and restitution. (*Id.* at 12–13.)

---

[3] Specifically, Plaintiffs asks for:
    (a) A declaration that the actions of the Defendants violate MHPAEA;
    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;
    (c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;
    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;
    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;
    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;
    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and
    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

According to Defendants, these are "merely [] roundabout way[s] of seeking compensatory damages for D.B.'s mental health treatment." (*Id.* at 13.) While these forms of relief may "take the form of money payment, [that] does not remove [them] from the category of traditionally equitable relief." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011) (permitting plaintiff to seek remedies of equitable surcharge, equitable estoppel, and reformation—notwithstanding the fact they may involve monetary payment—in a Section 1132(a)(3) claim); *see also Gimeno*, 38 F.4th at 914 ("[C]ertain kinds of monetary relief were typically available in equity, and this history must inform our interpretation of ERISA. … Since *Amara*, every circuit court to address the issue has recognized that Section 1132(a)(3) creates a cause of action for monetary relief for breaches of fiduciary duty.")

Plaintiffs seek six forms of relief that are not only traditionally equitable but the type of relief unavailable under Section 1132(a)(1)(B). Accordingly, the relief Plaintiffs seek in Count II falls within the scope of "other appropriate equitable relief" permitted under Section 1132(a)(3)

and is not duplicative of the relief sought in their Section 1132(a)(1)(B) claim.[4]

### 2.    Plaintiffs' Alleged Parity Act Violations

The Parity Act requires group health plans that provide medical and surgical benefits as well as mental health or substance abuse disorder benefits—like the Plan here—to ensure that "the treatment limitations applicable to such mental health or substance abuse disorder benefits are no more restrictive than" the treatment limitations applied to medical or surgical benefits.  29 U.S.C. § 1185a(a)(3)(A)(ii).  There are two ways a plaintiff can allege a Parity Act violation.  First, "she can make a categorical challenge by alleging she was denied coverage for mental health or substance abuse services based on [a treatment] limitation, in which case she must identify that limitation and compare it to limitations imposed (or not imposed) on analogous medical or

---

[4] In the event Plaintiffs prevail in this matter, the Court will ensure it grants relief in a manner that complies with Section 1132(a)(3) and other applicable precedent.  The Court understands Defendants' concerns that the declaration and injunction Plaintiffs seek may run afoul of the Eleventh Circuit's bar on certain "obey-the-law" orders.  *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999).  But at this stage, it is enough to say the relief Plaintiffs seeks is equitable in nature and could be granted under Section 1132(a)(3).

surgical services." *H.H.*, 342 F.Supp.3d at 1319. Second, "she can make an as-applied challenge by alleging that the mental health or substance abuse services at issue meet the criteria imposed by her insurance plan and that the insurer imposed some additional criteria to deny coverage of the services at issue." *Id.* Regardless of whether the challenge is categorical or as-applied, a plaintiff "must properly identify, either in the terms of the plan or the administrative record, the relevant treatment limitation supporting that charge." *Id.*

Plaintiffs appear to make three attempts to allege a Parity Act violation. They claim Defendants violated the Parity Act because (1) the Plan's facility eligibility criteria and wilderness program exclusion—which precluded coverage for Wingate—treat mental health programs more restrictively than comparable surgical or medical facilities; (2) the Plan's medical necessity criteria for mental health treatment—which precluded coverage for Crossroads—were more stringent than those applied to analogous medical or surgical care; and (3) the Plan failed to provide the same degree of in-network mental health residential treatment facilities as compared to analogous medical or surgical facilities. (Dkt. 1 ¶¶ 63–83.)

### i.    Denial of Coverage for Wingate

Plaintiffs suggest two ways by which Defendants' denial of coverage for Wingate violated the Parity Act.  First, they allege the Plan treats outdoor behavioral health and wilderness programs like Wingate less favorably than analogous medical or surgical facilities that also are assigned a revenue code by the National Uniform Billing Committee (NUBC).  (*Id.* ¶¶ 77–78.)  They allege the Plan "categorically exclude[s]" these facilities while not "categorically exclud[ing] any other analogous medical or surgical facilities with a NUBC code."  (*Id.*)

Defendants correctly identify two problems with this argument. (Dkt. 31-1 at 14–16.)  First, Plaintiffs fail to explain why or how NUBC codes are relevant to the Parity Act analysis.  (Dkt. 36 at 18–19.)  To properly allege a violation of the Parity Act, a plaintiff must show they were denied coverage for mental health or substance abuse services based on a "treatment limitation" that was not applied to analogous medical or surgical services—a third-party designation does not, in and

of itself, constitute a "treatment limitation" under the Plan.[5]  *See H.H.*,

342 F.Supp.3d at 1319.  Further, the Plan does not categorically exclude

outdoor behavioral health and wilderness programs.  It excludes only

those that lack the proper licensing, 24-hour nursing, or onsite

psychiatric treatment.  (Dkt. 31-2 at 78.)  So, NUBC code or not,

Plaintiffs' allegation of "categorical exclusion" does little to distinguish

Wingate from comparable medical and surgical facilities, which are also

subject to certain preconditions for coverage.  (*See, e.g.,* Dkt. 31-2 at 88,

90.)  Plaintiffs thus fails to allege plausibly a Parity Act violation from

the "categorical exclusion" of NUBC-coded mental health facilities.

---

[5] The Parity Act's implementing regulations define a "treatment limitation" as follows:

> Treatment limitations include limits on benefits based on the frequency of treatment, number of visits, days of coverage, days in a waiting period, or other similar limits on the scope or duration of treatment. Treatment limitations include both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations (such as standards related to network composition), which otherwise limit the scope or duration of benefits for treatment under a plan or coverage.

29 C.F.R. § 2590.712(a).

Second, Plaintiffs argue Defendants' denial of coverage for Wingate violated the Parity Act because the Plan's facility eligibility criteria for alternative residential programs, "such as 24-hour nursing care[, ] are rarely congruent with generally accepted standards of medical practice," and analogous medical/surgical facilities are not subject to similar limitations. (Dkt. 1 ¶ 67, 78.) Plaintiffs' bare allegation that analogous medical/surgical facilities are not subject to the same or similar criteria—with no attempt to identify such a facility in the Plan—is conclusory and insufficient to state plausible a Parity Act claim. (Dkt. 1 ¶ 67); *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") Moreover, the terms of the Plan belie this allegation. Analogous medical and surgical facilities under the Plan—specifically skilled nursing facilities and inpatient rehabilitation hospitals—are subject to 24-hour nursing requirements. (Dkt. 31-2 at 90 (requiring skilled nursing facilities provide "24-hour patient care by a staff of licensed nurses" for coverage);

22

88 (providing all hospitals must have "24-hour nursing services" to qualify for coverage).)[6]

Plaintiffs' Parity Act claim regarding Wingate fails as a matter of law.

### ii.    Denial of Coverage for Crossroads

Plaintiffs allege Defendants violated the Parity Act by applying more restrictive medical necessity criteria to mental health and chemical dependency treatment at Crossroads than to comparable surgical or medical treatment covered by the Plan. (Dkt. 1 ¶¶ 71–76.) In particular, Plaintiffs allege that applying certain "acute criteria" to determine medical necessity for facilities like Crossroads violates the Parity Act as Defendants do not use comparable "acute criteria" to assess medical

---

[6] Administrative guidance corresponding to the Parity Act's implementing regulations, 29 C.F.R. § 2590.712, specifically equate mental health residential treatment with skilled nursing facilities and rehabilitation hospitals. *See* Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi-State Plan Program, 78 Fed. Reg. 68240, 68247 (Nov. 13, 2013) ("For example, if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit.").

necessity for medical or surgical treatment. (*Id.*) Under 29 C.F.R. §2590.712(c)(4)(ii)(A), the inclusion of such criteria for mental health benefits but not for medical or surgical benefits could constitute a "treatment limitation" that violates the Parity Act.[7] Plaintiffs, however, fail to identify the specific medical necessity criteria Defendants use for analogous medical or surgical treatment and, as a result, their allegations of disparity are conclusory. *See Iqbal*, 556 U.S. at 678; *H.H.*, 342 F.Supp.3d at 1319.

Plaintiffs admit they "do not have the medical necessity guidelines that Defendants use to establish medical necessity" for medical and surgical treatment and allege they "exercised reasonable efforts to obtain the information" but Defendants did not provide it. (Dkt. 1 ¶ 39; 36 at 18.) Defendants tell a different story. Defendants argue Plaintiffs "*did* have copies of the medical necessity criteria" at the time they filed the

---

[7] 29 C.F.R. §2590.712(c)(4)(ii)(A) reads as follows:

Nonquantitative treatment limitations include—

(A) Medical management standards (such as prior authorization) limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative.

Complaint because they "attached [the criteria] to their May 15, 2024 prelitigation appeal." (Dkt. 37 at 10.)  And even if Plaintiffs did not have the relevant criteria at that time, Defendants claim they provided Plaintiffs a copy of the criteria 10 days before filing the instant motion. (*Id.* at 11.)

Given the close call as to whether Plaintiffs' allegations of a Parity Act violation at Crossroads are plausible or conclusory, as well as the uncertainty surrounding whether and when Plaintiffs received the criteria, the Court will permit Plaintiffs to replead Count II solely as this issue with Crossroads.[8]  Now that Plaintiffs have unquestionably received the relevant criteria from Defendants, the amended Count II should specifically identify the criteria, if any, used to determine medical necessity for mental health treatment under the Plan but missing in assessing medical necessity for analogous medical or surgical treatment.

---

[8] Plaintiffs may not rehash any argument related to Wingate in their amended Count II.  The Court merely gives Plaintiffs the opportunity to restate their allegations pertaining to a Parity Act violation for denial of coverage for Crossroads on account of Defendants' medical necessity criteria.  Plaintiffs may not plead any other basis for finding a Parity Act violation.

### iii.    Network Inadequacy

Finally,  Plaintiffs allege Defendants violated the Parity Act by failing "to provide a comparable degree of in-network residential treatment facilities compared to the degree of in-network skilled nursing and inpatient rehabilitation facilities." (Dkt. 1 ¶ 79.)  This claim hinges on Plaintiffs' allegation that "there were sixteen in-network psychiatric residential facilities within a one-hundred-mile radius of [their] home" while, "in the same radius, there were … six-hundred-forty-five in-network skilled nursing facilities." (*Id.* ¶ 52.)  Defendants argue Plaintiffs lack standing to assert the network was inadequate.  (Dkt. 31-1 at 21.)  The Court agrees.

To establish standing to sue, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs have not shown their injuries are fairly traceable to Defendants' allegedly inadequate network.  At bottom, Plaintiffs' alleged injuries stem from the denial of coverage for Wingate—because the facility failed to meet the Plan's criteria—and for Crossroads—because D.B. did not satisfy the

applicable medical necessity requirements.  Neither Plaintiffs' Complaint nor Response try to explain the causal connection between Defendants' alleged network inadequacy and the denial of benefits at Wingate or Crossroads.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]here must be a causal connection between the injury and the conduct complained of.")  Even if there were a more "adequate" network of providers, that would not change the fact that Wingate did not meet the plan's criteria for coverage or that D.B. did not satisfy the Plan's medical necessity requirements for treatment at Crossroads.  Without more from Plaintiffs, any connection between their alleged injuries and the number of in-network treatment facilities is too speculative to confer standing.

## IV.  Conclusion

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Partial Motion to Dismiss (Dkt. 31).  Plaintiffs may amend Count II of their Complaint within thirty (30) days in a manner that complies with this Order, specifically to reallege their Parity Act claim against Crossroads as described above.  Counts I and II are **DISMISSED** as they pertain to Wingate.

**SO ORDERED** this 20th day of January, 2026.

_____

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE